| | |
|---|---|
| MARIANAS LEGAL STRATEGY GROUP, LLC<br>SEAN E. FRINK, F0212<br>MARCIA K. SCHULTZ, F0156<br>sfrink@marianaslaw.com<br>mschultz@marianaslaw.com<br>Flametree Terrace, 2nd Floor<br>Isa Drive, Capitol Hill<br>PMB 323, Box 10001<br>Saipan, MP 96950<br>Telephone No. 670.322.9991<br>Facsimile No. 670.322.9993<br><br>Attorneys for Plaintiffs The Boeing Company<br>and Boeing Service Company | FILED<br>Clerk<br>District Court<br><br>NOV 20 2013<br><br>for the Northern Mariana Islands<br>By _____<br>(Deputy Clerk) |

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| THE BOEING COMPANY and<br>BOEING SERVICE COMPANY,<br><br>        Plaintiffs,<br><br>vs.<br><br>LEO A. DALY COMPANY,<br><br>        Defendant. | CIVIL ACTION NO. CV 13-0027<br><br>COMPLAINT AND DEMAND FOR<br>JURY TRIAL |

## COMPLAINT

Plaintiffs The Boeing Company and Boeing Service Company (hereinafter collectively, "Boeing"), by their undersigned attorneys, hereby assert claims against Defendant Leo A. Daly Company ("LAD").

1

# INTRODUCTION

1.  Leo A. Daly Company ("LAD") has littered the Northern Mariana Islands with inadequately designed buildings. This action is for breach of contract, indemnity, malpractice, negligence, fraud, consumer fraud, building code violations, and bad faith, all arising out of LAD's defective design of a terminal addition at the Saipan International Airport. The Commonwealth Ports Authority ("the CPA") contracted with Boeing to procure the design and ultimate construction of the addition ("the Project"), and Boeing entered into two comprehensive subcontracts with LAD under which LAD was responsible for both the design and construction management of the Project. LAD promised, among other things, that the Project would be designed and completed in accordance with all applicable building codes. Moreover, LAD agreed to comprehensive indemnification terms under which LAD indemnified Boeing against any damages, liabilities, or expenses, including counsel fees, arising out of LAD's negligent or willful acts.

2.  LAD made critical errors in the design of the Project. Specifically, LAD failed to design the Project consistent with applicable seismic codes governing earthquake resistance—it completely ignored applicable seismic code requirements. As a result, the Project as designed by LAD and built contains serious structural deficiencies, and also caused the existing structure—to which the Project was connected—to violate seismic code requirements by more than tripling the mass of the existing structure without seismically upgrading it, rendering the existing structure seismically hazardous. Unfortunately, as Boeing later learned, LAD's errors were not unique to this project: in fact, LAD made similar errors on at least two other projects within the Commonwealth of the Northern Mariana Islands.

2

3. As a result of LAD's negligent and deficient design, the CPA issued a demand to Boeing, demanding that Boeing tear down and rebuild the project and pay the CPA millions of dollars in damages and attorneys' fees. Boeing in turn issued a letter to LAD tendering the defense and indemnity of Boeing to LAD which LAD did not accept without reservation. The CPA and Boeing negotiated the matter for more than a year, and Boeing kept LAD informed of the status of the negotiations. Because the Project as designed by LAD was in violation of the applicable code, and because LAD had committed (among other things) clear negligence and a breach of contract, Boeing attempted to involve LAD in the negotiations, to solicit LAD's input into the most efficient way to repair the facility and resolve the dispute, and to resolve all disputes at once. LAD did not accept Boeing's tender of the CPA's claim without reservation and did not participate in good faith in the parties' discussions, and thus Boeing negotiated a full and fair settlement of the CPA's claims against Boeing relating to LAD's negligence.

4. LAD cannot dispute that it negligently designed and constructed the Project and that the structure designed and built by LAD violates, among other things, the applicable building codes and LAD's contracts with Boeing. Unfortunately, LAD refused to fix the structure, to settle the parties' dispute, or to reimburse Boeing for the damages caused by LAD's errors. Accordingly, Boeing had no choice but to file this action.

**PARTIES**

5. Boeing Service Company is a Delaware corporation with its principal place of business in Illinois. Boeing Service Company is a wholly owned subsidiary of The Boeing Company, a Delaware corporation with its principal place of business in Illinois and the world's largest aerospace company and a leading manufacturer of commercial jetliners and defense,

space, and security systems. Boeing worked closely with the federal government to implement upgraded security systems following the terrorist attacks of September 11, 2001.

6. LAD is a Nebraska corporation with its principal place of business in Omaha, Nebraska. LAD describes itself as an "internationally renowned architecture, planning, engineering, interior design and program management firm," and claims that it can "produce lasting structures and enduring client relationships." LAD's poor workmanship on the Saipan airport addition, among other projects, entirely belies these claims.

## JURISDICTION AND VENUE

7. This court has diversity jurisdiction in this action pursuant to 28 U.S.C. § 1332. Plaintiff is a Delaware corporation with a principal place of business in Illinois. Defendant is a Nebraska corporation with a principal place of business in Nebraska. The amount in controversy far exceeds $75,000, exclusive of interest and costs.

8. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), because the events giving rise to Boeing's causes of action occurred in the Commonwealth of the Northern Mariana Islands ("CNMI"). Specifically, LAD negligently and in breach of its agreements with Boeing designed the addition to an airport terminal at the Saipan International Airport.

## GENERAL ALLEGATIONS

**The Saipan Airport Project and Boeing's Contracts with LAD**

9. In the wake of September 11, 2001, the United States Government issued a series of grants designed to improve airport security. The CPA received one such grant, and was directed to install certain security-based capital improvements at the Saipan International Airport, including expanding the terminal area to create space for new Transportation Security Administration ("TSA") officers and a baggage screening system.

4

10. On February 12, 2004, the CPA entered into a contract with Boeing to procure the design and construction of the capital improvements to the Saipan Airport. The Project was divided into two phases: design and construction. Because Boeing's expertise related to other aspects of the project, and Boeing did not have the expertise to design or manage construction on a structural addition to an airport terminal, Boeing retained various subcontractors to provide design, construction, and construction management services for the Project.

11. LAD was Boeing's key subcontractor on the Project. In March 2004, LAD entered into a contract with Boeing for Architect & Engineering Design Services for the Project. (*See* Ex. A). In October 2005, LAD entered into another contract for construction management services at the site. (*See* Ex. B).

12. LAD provided a warranty promising that "work done under this Contract [would] be performed in compliance with all applicable laws, rules, regulations, ordinances, deed restrictions and building codes." (Ex. A, Attachment No. II, Article IV)

13. LAD also, in several different provisions, contractually indemnified Boeing against LAD's negligence, errors, or omissions, as well as any failure of LAD to meet its obligations under the contract. For example, LAD agreed that it "shall be liable for all loss or damage to Boeing, its parent, directors, officers, agents, employees, and customers arising from [LAD's] failure to comply . . . and any negligent act, error or omission of [LAD], its agents and employees." (Ex. A, Attachment No. II, Article XV)

14. LAD further agreed that, in the event LAD breached its obligations under the contract, "Boeing may, at its option, by contract or otherwise, replace or correct any defective materials or conditions resulting from [LAD's] failures, acts, errors and omissions and recover the cost thereof from [LAD]." (Ex. A, Attachment No. II, Article XV)

15.     The design contract also obligated LAD to indemnify Boeing for any negligent acts or omissions by LAD:

> [LAD] hereby indemnifies and holds Boeing, its agents and employees, harmless against any claims, actions or demands against Boeing, its parent, agents and employees and against any damages, liabilities or expenses, including counsel fees, for injury to or death of any person and for loss of or damage to any property, arising out of the negligence or willful acts of [LAD], [LAD's subcontractors] or anyone directly or indirectly employed by them.

(Ex. A, Attachment No. II, Article XIV).

16.     The Project required LAD to design and manage the construction of an addition to the Saipan Airport's existing terminal, which was built in 1974 as the airport's primary terminal. The addition as designed by LAD was attached structurally to the existing building. The addition consists of two levels: terminal space at the ground level, and a space for security and baggage screening equipment and TSA personnel on the lower level.

17.     The 1991 Uniform Building Code ("UBC-91"), as published by the International Conference of Building Officials, was the building code in effect in the CNMI at the time the addition was designed and constructed. Although LAD represented to Boeing that its design was consistent with all applicable laws (including UBC-91), in reality LAD's design violated UBC-91 in numerous respects.

18.     At the time the project was complete, Boeing did not know, and had no reason to suspect, that LAD had not delivered what it had promised and represented: an airport addition that complied with the applicable building codes. LAD actively concealed its misconduct. LAD's final structural documents for the Project represented that the terminal had been designed to meet at least the requirements necessary for Seismic Zone 3—an area with moderate-to-high

6

probability of damaging ground motion, which was required for the region. Specifically, LAD's documents stated that its design was in compliance with the UBC-91 and that the seismic loads used for the design had been applied in accordance with UBC-91, Zone 3. Boeing is not an expert on seismic design requirements, and reasonably relied on LAD to provide expertise on such issues during the Project. Accordingly, Boeing was not aware, and had no reason to be aware, that LAD's services had been performed well below the applicable standard of care.

**LAD's Defective Design Is Discovered**

19.     On October 12, 2011, the CPA sent a letter to Boeing, noting that a visual inspection revealed that cracks had appeared in the airport terminal's roof. The CPA requested that Boeing investigate the cause of the roof damage as soon as practicable. Boeing immediately gave notice to LAD, and invited LAD to a site visit at the Saipan International Airport. The CPA, Boeing, and LAD all visited the airport to inspect the site in November 2011.

20.     Boeing promptly retained an outside structural engineering consultant to investigate the issues identified by the CPA. This investigation revealed cracking on the building's canopy, in a basement floor slab, and on some walls. Boeing also discovered that the columns used to support the roof canopy were settling. Boeing conducted a preliminary seismic and wind evaluation of the facility and discovered significant deficiencies in the seismic resistance of the addition designed and built by LAD.

21.     Boeing also discovered, after further analysis by its structural engineering consultant, that while LAD represented to Boeing on the structural documents for the Project that the terminal had been designed to meet at least the seismic requirements of Seismic Zone 3—an area with moderate-to-high probability of damaging ground motion, which was required for the region—the building had actually only been designed to meet the requirements of Seismic Zone

1, which would only be appropriate for areas with low probability of damaging ground motion, not the CNMI.

22. Because LAD designed the addition in violation of seismic code requirements, it requires at least an extensive structural retrofitting. Moreover, LAD's addition has caused the entire terminal building to violate the seismic code requirements, such that any Project retrofit must also address the problems LAD has introduced to the main terminal building.

23. Boeing soon learned that LAD's deficiencies were not limited to LAD's work for Boeing, but were also present in other construction projects in the Commonwealth. Specifically, the CPA advised Boeing that LAD had provided seismically-deficient architectural and engineering services to the CPA for a separate, unrelated project at the Tinian Airport and that LAD had similarly seismically under-designed a third project at a local hospital.

**The CPA's Demands, And Boeing's Efforts To Fix LAD's Mistakes**

24. On February 15, 2012, the CPA made a written demand ("the Demand") upon Boeing relating to the deficiencies with the Project. The CPA recognized in the Demand that LAD "likely is the primarily responsible party" for the deficiencies with the Project, but made its demand on Boeing because the CPA was in privity of contract with Boeing rather than LAD. The CPA demanded that Boeing "fully remedy the defects in the structure and provide the CPA with the bargain which it sought." More specifically, in the Demand, the CPA requested "a complete teardown and rebuild and that all damages, furthermore, be paid."

25. The CPA also provided Boeing with a copy of a draft complaint it intended to file against Boeing unless the matter was resolved to its satisfaction (the "CPA Complaint"). In the CPA Complaint, the CPA charged Boeing with breach of contract, professional malpractice, negligence, violations of the CNMI Consumer Protection Act, 4 CMC § 5105 *et seq.*, fraud, and

8

violations of the CNMI building code, 2 CMC §§ 7111, 7126, 7142, 7146, and 7147. The CPA Complaint sought damages exceeding $20,000,000, as well as costs, attorney's fees, and other relief. All claims raised in the CPA's draft complaint arose from the negligent work of LAD.

26. Boeing provided copies of the Demand and the CPA Complaint to LAD. LAD neither accepted without reservation nor rejected the tender of the Demand and/or the CPA Complaint by Boeing, nor did LAD take any action to negotiate a resolution of the matter or fix the project that it designed negligently and in violation of the applicable building codes. Instead, LAD tried to insert inappropriate and unaccepted qualifiers into its participation in any resolution, rejecting the obligations to which it had clearly agreed and the obligations imposed upon it as a matter of law.

27. Despite LAD's refusal to participate seriously in the discussions about fixing its errors, Boeing and the CPA continued discussions.

28. On April 8, 2013, the CPA filed a lawsuit against Boeing for breach of contract, seeking damages arising out of and relating to the defects in the design, engineering and construction of the addition caused by LAD's negligence.

29. Ultimately, following extensive follow-up negotiations, the CPA and Boeing reached a settlement in principle, subject to certain conditions. The settlement is a reasonable resolution of the CPA's claims against Boeing, all of which relate to the negligence or willful misconduct of LAD.

30. LAD, however, refused to settle with either Boeing or the CPA. Indeed, LAD refused to participate in good faith with either party in negotiating a settlement of the matter and fixing the building it had designed and built negligently and in violation of, among other things, the applicable building codes.

# COUNT I
### (Breach of Contract)

31. Boeing realleges and incorporates by reference the factual allegations in paragraphs 1 through 31 as though fully set forth herein.

32. LAD contractually promised Boeing that, among other things:

- "work done under this Contract [would] be performed in compliance with all applicable laws, rules, regulations, ordinances, deed restrictions, and building codes" and

- "all services performed" by LAD would be "performed by persons who are experienced and highly skilled in their professions and in accordance with the high standards of workmanship in their field."

33. LAD failed to design the Project to meet applicable building code requirements, including seismic stress requirements and other ordinarily expected design standards. LAD's services were also well below the standards of workmanship promised to Boeing.

34. At the time the project was complete, Boeing did not know, and had no reason to suspect, that LAD had not delivered what it had promised: an airport addition that complied with the applicable building codes. LAD actively concealed its misconduct and affirmatively represented that its design complied with the applicable building codes. Accordingly, Boeing was not aware, and had no reason to be aware, that LAD's services had been performed well below the applicable standard of care.

35. LAD's breach of contract caused significant damages to Boeing, including the costs associated with the investigation of LAD's design defects, the costs of retrofitting the Project, the costs and attorneys' fees associated with negotiating and settling demands from the CPA, and the settlement with the CPA.

## COUNT II
### (Express Contractual Indemnity)

36. Boeing realleges and incorporates by reference the factual allegations in paragraphs 1 through 36 as though fully set forth herein.

37. LAD also agreed to contractually indemnify and hold Boeing harmless from any claims, actions, or demands arising out of LAD's negligence related to the Project. And LAD agreed to reimburse Boeing for any and all costs resulting from defective conditions caused by LAD's failures, errors, acts, or omissions.

38. LAD breached these obligations by refusing to accept the tender of the CPA's claims without reservation, refusing to fix the problems it created, and refusing to negotiate in good faith a resolution of the issues it created.

39. LAD's negligent design and construction management of the Project alone caused the defective condition of the Project, which led to an investigation of the Project and demands made upon Boeing by the CPA. LAD's negligent actions caused significant damages to Boeing, including the costs associated with the investigation of LAD's design defects, the costs of retrofitting the Project, the costs and attorneys' fees associated with negotiating and settling demands from the CPA, and the settlement with the CPA.

## COUNT III
### (Implied Contractual Indemnity)

40. Boeing realleges and incorporates by reference the factual allegations in paragraphs 1 through 40 as though fully set forth herein.

41. LAD entered into contracts with Boeing under which LAD agreed to provide design and construction management services for the Project.

42. LAD's agreement to indemnify Boeing from any and all damages resulting from LAD's failure to properly design and/or manage the construction of the Project is implied from the terms of those contracts.

43. LAD failed to design the Project to meet applicable building code requirements, including seismic stress requirements and other ordinarily expected design standards. LAD's services were also well below the standards of workmanship promised to Boeing.

44. LAD's negligent design and construction management of the Project alone caused the defective condition of the Project, which led to an investigation of the Project and demands made upon Boeing by the CPA. LAD's negligent actions caused significant damages to Boeing, including the costs associated with the investigation of LAD's design defects, the costs of retrofitting the Project, the costs and attorneys' fees associated with negotiating and settling demands from the CPA, and the settlement with the CPA.

## COUNT IV
(Professional Malpractice)

45. Boeing realleges and incorporates by reference the factual allegations in paragraphs 1 through 45 as though fully set forth herein.

46. LAD had a duty to perform the contracted design and construction management services in a professional, workmanlike manner, to meet building code and safety requirements, and to meet industry standards for design and construction management.

47. LAD committed professional malpractice by failing to conform to its professional duty to exercise due care in its provision of design and construction management

services to Boeing. Specifically, LAD failed to design a code-compliant airport addition as was required for the Project. LAD then breached its obligation to defend and indemnify Boeing.

48. LAD's professional malpractice caused significant damages to Boeing, including the costs associated with the investigation of LAD's design defects, the costs of retrofitting the Project, the costs and attorneys' fees associated with negotiating and settling demands from the CPA, and the settlement with the CPA.

## COUNT V
### (Negligence)

49. Boeing realleges and incorporates by reference the factual allegations in paragraphs 1 through 49 as though fully set forth herein.

50. At all relevant times, LAD was responsible for the design and construction management of the Project.

51. LAD owed a duty to Boeing to refrain from negligent acts and omissions in carrying out its responsibilities with respect to the Project.

52. LAD was negligent when it produced a design for the Project which did not meet applicable building code requirements or industry standards.

53. LAD was negligent when it implemented its defective design for the Project in its management of the construction of the airport addition.

54. LAD's negligence foreseeably and proximately caused the defective condition of the Project, and the concomitant damages to Boeing.

55. LAD's negligence caused significant damages to Boeing, including the costs associated with the investigation of LAD's design defects, the costs of retrofitting the Project, the

costs and attorneys' fees associated with negotiating and settling demands from the CPA, and the settlement with the CPA.

## COUNT VI
### (CNMI Consumer Protection Act)

56. Boeing realleges and incorporates by reference the factual allegations in paragraphs 1 through 56 as though fully set forth herein.

57. At all material times, there was in full force and effect a Commonwealth of the Northern Marianas statute known as the Consumer Protection Act, 4 CMC § 5101 *et seq.* ("the Act").

58. The Act provides, in relevant part, that "[t]he following unfair methods of competition and unfair and deceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful:

> (e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . .
>
> (g) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another . . .
>
> (l) Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding . . .
>
> (m) Engaging in any act or practice which is unfair or deceptive to the consumer . . .
>
> (o) Representing that goods or services are fit for any particular purpose, if they are not fit for that purpose . . .
>
> (p) Failing to reveal any known defect in or damage to any item entered in commerce, unless the item is stated to be so entered on an 'as is' or similar basis . . .
>
> (r) Introducing into commerce any good or service which the merchant knows or should know is unsafe or which the merchant

> knows or should know may cause an unsafe condition in normal use, including performing a service which may cause an unsafe condition . . .
>
> (bb) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not . . .

4 CMC § 5105.

59. The Act provides that "[a]ny person aggrieved as a result of a violation of this Act may bring an action in the Commonwealth Trial Court for such legal or equitable relief as the court may order. In addition to actual damages, the court shall award liquidated damages in an amount equal to the actual damages in cases of willful violations, and shall award costs and reasonable attorney's fees if the plaintiff prevails." 4 CMC § 5112.

60. Boeing engaged LAD on the Project because Boeing did not have the expertise to design and manage the addition to an airport terminal. LAD was supposed to be the expert on the project, and Boeing was a mere consumer of its services.

61. LAD willfully represented to Boeing that its design of the Project would meet and did meet the appropriate building code requirements. LAD further willfully represented to Boeing that it had designed the Project and implemented its design in accordance with those requirements.

62. In fact, LAD's representations were false, and the Project did not meet the applicable seismic code requirements.

63. LAD did not reveal the defects in its design and construction to Boeing until the damages from its misrepresentations were unavoidable. Indeed, the falsity of LAD's representations and the resulting problems with the Project were not known until after the Project was fully constructed.

64. LAD knew or should have known that its design did not meet the applicable building code requirements, making the Project unsafe.

65. Thus, the design and construction management services provided by LAD were in violation of the Act, were misleading and deceptive, and were unfair to Boeing the consumer.

66. LAD's violations of the Act caused significant damages to Boeing, including the costs associated with the investigation of LAD's design defects, the costs of retrofitting the Project, the costs and attorneys' fees associated with negotiating and settling demands from the CPA, and the settlement with the CPA.

## COUNT VII
(Building Code Violations)

67. Boeing realleges and incorporates by reference the factual allegations in paragraphs 1 through 67 as though fully set forth herein.

68. At all material times, there was in full force and effect a Commonwealth of the Northern Marianas statute known as the Building Safety Code, 2 CMC § 7111 *et seq.* ("the Building Code"). The Building Code states that its purpose is "to secure and promote the safety, health and general welfare of the people of the Northern Marianas by providing standards for the location, design, material, construction, enlargement, maintenance, use, occupancy, and moving of buildings and structures in the Commonwealth." 2 CMC § 7111.

69. The Building Code provides in relevant part that "[i]t shall be unlawful for any person, firm or corporation to construct, enlarge, move, equip, use, occupy or maintain any building or structure, or cause to permit the same to be done, in violation of any provisions of this building safety code…" 2 CMC § 7126(a).

70. The Building Code also provides for a private action to enforce violations. In relevant part, the Building Code states:

> Notwithstanding any other remedies available, any person damaged economically, injured or otherwise aggrieved as a result of a violation of the building safety code has a cause of action against the person who committed the violation. Violation of the building safety code shall constitute a per se public nuisance. An award shall include damages and the costs of litigation including reasonable attorney's fees.

2 CMC § 7126(d).

71. As the designer and construction manager for the Project, LAD violated the Building Code, specifically 2 CMC § 7142, which adopts the Uniform Building Code.

72. As the designer and construction manager for the Project, LAD violated the Building Code, specifically 2 CMC § 7146, which requires that a building be designed and constructed to withstand certain earthquake forces as set forth by the Uniform Building Code.

73. As a result of LAD's actions, the Project violated the Building Code. Thus, LAD's violations constitute per se public nuisances.

74. As a direct and proximate result of LAD's Building Code violations, Boeing was damaged. LAD's violations of the Building Code caused significant damages to Boeing, including the costs associated with the investigation of LAD's design defects, the costs of retrofitting the Project, the costs and attorneys' fees associated with negotiating and settling demands from the CPA, and the settlement with the CPA.

**COUNT VIII**
(Bad Faith)

75. Boeing realleges and incorporates by reference the factual allegations in paragraphs 1 through 75 as though fully set forth herein.

76. Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. Particularly here, as an indemnitor, LAD owed Boeing a duty of good faith.

77. LAD flagrantly violated its duties of good faith, including but not limited to:

- On information and belief, LAD's then-general counsel told the CPA that it should pursue Boeing for the errors LAD had committed on the Project even though he and LAD were well aware that LAD was wholly at fault;

- LAD refused to negotiate a settlement of its own errors on the Project in good faith even though it knew that LAD's design of the Project did not comply with the applicable building codes;

- LAD refused to even consider negotiating a settlement that would mitigate Boeing's exposure for the errors created by LAD's own design;

- LAD refused to fix the Project despite admitting that it did not comply with the building code;

- LAD denied a duty to indemnify in the face of clear written evidence that it had a duty to indemnify, and instead manufactured arguments it knew were baseless in an effort to avoid its indemnity obligations; and

- LAD refused to perform the obligations to which it had agreed in the case of a claim raised against Boeing due to LAD's negligence, significantly impairing the benefits which LAD agreed to provide to Boeing in the contract.

78. On information and belief, LAD's misconduct is similar to that it committed on two other projects within the CNMI. Even when confronted with evidence that it under-designed a public structure in violation of the building code, LAD refused to fix the building. Here, however, it was worse—not only did LAD refuse to remedy its errors, but LAD refused to honor clear written promises it made to an indemnitee who was forced to fix LAD's problem.

79. LAD's violations of its duties of good faith were committed with malice. LAD's violations should subject it not only to compensatory damages covering all of Boeing's out-of-pocket costs and expenses in connection with fixing the Project and this litigation, but

also to punitive damages designed to punish LAD's outrageous conduct and deter similar violations from LAD and others in the future.

* * *

WHEREFORE, Boeing requests that the Court:

A. Enter judgment in its favor and against LAD on all claims raised in this complaint;

B. Award Boeing compensatory damages against LAD in an amount to be established at trial, but believed to be in excess of $ 5 million;

C. Require LAD to reimburse Boeing for all of its costs, including all of the costs incurred in the analysis of LAD's errors and the design of a repair for those errors, as well as Boeing's attorneys' fees;

D. Award Boeing punitive damages as a result LAD's outrageous conduct in an amount to be established at trial; and

E. Grant Boeing and such other relief as the Court deems just and proper.

**JURY DEMAND**

Boeing hereby demands a trial by jury of any issue triable of right by a jury pursuant to Federal Rule of Civil Procedure 38.

///

///

///

///

///

///

Dated: November 20, 2013        Respectfully submitted,

MARIANAS LEGAL STRATEGY GROUP LLC

*[signature]*

Marcia K. Schultz, F0156
Sean E. Frink, F0212
Attorneys for Plaintiffs The Boeing Company and
Boeing Service Company

Michael B. Slade *(pro hac vice pending)*
Elizabeth S. Hess *(pro hac vice pending)*
James N. Nowacki, P.C. *(pro hac vice pending)*
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
michael.slade@kirkland.com
elizabeth.hess@kirkland.com
james.nowacki@kirkland.com